SOUTH PENN OIL COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 21975. Promulgated July 17, 1951.

*Sidney B. Gambill, Esq., Thomas J. McManus, Esq.,* and *Norman D. Keller, Esq.,* for the petitioner.

*W. Morgan Hunter, Esq.,* for the respondent.

30

40

LEECH, *Judge:* The first issue is whether petitioner is entitled to deductions for the taxable years 1942, 1943, and 1944 in the amounts of $299,572.44, $262,074.29, and $102,798.72, respectively, on account of payments to or deposits with Equitable in the years 1933 to 1937, inclusive, with respect to services of petitioner's employees rendered prior to 1933.

The amounts of these contested deductions are not in dispute. Nor is the right thereto contested if the payments of the amounts basing these deductions were made to a trust which was within the meaning of "trust" as used in section 165 [1] of the pertinent statutes. (See section 23 (p) (2) of the Internal Revenue Code hereinafter set out as footnote 3.) The crux of the case, therefore, is whether the agreement of petitioner and Equitable in 1933 and the payments thereunder in effectuating the provisions of the plan of petitioner created such a trust.

The respondent argues that the agreement between petitioner and Equitable was not a trust, but created a mere debtor-creditor relationship or a simple contractual liability. In support of his position the respondent argues that no trust was created because there was no trust *res;* the payments made by petitioner to Equitable were commingled with other funds of Equitable; Equitable agreed to pay interest on the funds; the contract provided that the employees of petitioner could not bring any action against Equitable; that Equitable dealt with itself when it purchased annuities from itself, as petitioner agrees; and it has not been shown that Equitable, under its charter, could act as trustee.

Under the agreement in question, Equitable was to "receive" certain payments denominated "premium payments," which consisted of contributions by petitioner and its eligible employees under the plan to provide pensions in the form of annuities when the employees reached the age of retirement. The payments were made to and received by Equitable for the purpose specifically set forth in the agreement, and Equitable was bound to keep them intact for the benefit and security

---

[1] REVENUE ACT OF 1932.

SEC. 165. EMPLOYEES' TRUSTS.

A trust created by an employer as a part of a stock bonus, pension, or profit-sharing plan for the exclusive benefit of some or all of its employees, to which contributions are made by such employer, or employees, or both, for the purpose of distributing to such employees the earnings and principal of the fund accumulated by the trust in accordance with such plan, shall not be taxable under section 161, but the amount actually distributed or made available to any distributee shall be taxable to him in the year in which so distributed or made available to the extent that it exceeds the amounts paid in by him. * * *

[The corresponding sections of the Revenue Acts of 1934 and 1936 are the same as the above section of the Revenue Act of 1932, which are all pertinent to this proceeding by virtue of the provisions of section 23 (p) (2) of the Internal Revenue Code hereinafter set out as footnote 3.]

of petitioner's employees. These payments so made constituted a *res* sufficient to meet the requirement that a trust must have a *res*. In the circumstances existing here, the fact that Equitable commingled these funds with its own funds did not destroy their identity as trust funds since these funds were segregated and identified on the books of Equitable. See cases cited at 54 Am. Jur., sec. 256, p. 199.

The contention of the respondent that no trust was created because Equitable was required to pay interest is without merit. Equitable did not agree to pay "interest" to petitioner. The agreement is that the combined premium funds, (A) and (B), will produce an amount designated as "working amount of interest," which Equitable guaranteed would be not less than 3½ per cent and which amount was to be credited annually to Fund (B). Any excessive earnings of Equitable, above a certain minimum, were to be treated likewise. Petitioner then agreed that an amount called "interest" would be periodically charged to Fund (B) and credited to Fund (A). Four per cent was the amount so charged and credited. Since the agreement between the parties otherwise evidences their intention that the fund is to be held in trust, the fact that Equitable has contracted to pay a fixed income called "interest" is not controlling and does not preclude the existence of a trust relationship. *Conley* v. *Johnson*, 101 Mont. 376, 54 P. 2d 585; *People* v. *Illinois Bank & Trust Co. of Benton*, 290 Ill. App. 521, 8 N. E. 2d 953; *Andrews* v. *Hood, Com. of Banks*, 207 N. C. 499, 177 S. E. 636. The case of *Pittsburgh National Bank of Commerce* v. *McMurray*, 98 Pa. 538, relied upon by the respondent, does not hold to the contrary.

The contention of respondent that no trust was created because it was provided that employees of petitioner could not bring any action against Equitable is baseless. The agreement contains no general provision limiting the right of employees to sue Equitable. The respondent's argument is premised solely on a provision contained in paragraph VII, *Sufficiency of Premium Funds*, which provides, with respect to both Funds (A) and (B), in substance, that Equitable makes no representation and assumes no liability as to the sufficiency of either Fund (A) or (B), to purchase the annuities provided by the agreement, etc., and that it is "the intention of the parties to this contract that no employee shall have any right against the Equitable with respect to any action or omission on its part hereunder." This limitation is applicable solely to the provision relating to the sufficiency of the funds. Equitable was merely to "receive" the funds and apply them to the purposes set forth. Since Equitable had not agreed to undertake that sufficient funds would be provided to carry out the plan as agreed between petitioner and its employees, it is obvious that it could not be held responsible for petitioner's failure to make sufficient payments.

We think it does not and was not intended to prevent an employee from enforcing in equity any right belonging to him under the contract.

The argument that the fact that Equitable, in effect, purchased annuities from itself and was thus dealing with itself in such a manner as to contradict the existence or intended existence of a trust status, is not impressive. The general rule is, of course, that a trustee can not legally deal with itself. But this rule is not applicable where, as here, the contract creating the relationship specifically permitted such dealing. *Worcester Bank & Trust Co.* v. *Nordblom*, 285 Mass. 22, 188 N. E. 492, 494. Moreover, the beneficiaries, employees, were advised of the contents of that contract and by continuing to work under that contract acquiesced in those terms.

The final contention of the respondent that no trust has been established because it has not been shown that Equitable under its charter has the right to act as trustee, is also without merit. The general rule of law is that there is a presumption that an act of a corporation is not *ultra vires*. See cases cited in Fletcher on Corporations, vol. 6, sec. 2505, 1931 ed. In the absence of evidence to rebut the presumption, it prevails. Equitable is a New York corporation. An insurance company's right to hold funds in trust is clearly recognized in that state. See section 15, Personal Property Law, N. Y.

The test as to whether a trust or a debt is created depends upon the intention of the parties. Restatement of the Law of Trusts, sec. 12. A trust has been authoritatively defined as a holding of property subject to the duty of employing it or applying its proceeds according to the directions given by the person from whom it was derived. Thus in *Hibbard, Spencer, Bartlett & Co.*, 5 B. T. A. 464, we discussed at considerable length the elements necessary to constitute a valid trust. See also *Elgin National Watch Co.*, 17 B. T. A. 339; *Appeal of Rodgers*, 361 Pa. 51, 62 A. 2d 900; *Coparo* v. *Propati*, 127 N. J. E. 419, citing with approval *Kane* v. *Bloodgood*, 7 Johns. Ch. 90; 11 Am. Dec. 47.

Section 165 (a) provides for a pension trust but does not define such term. In the recent case of *Tavannes Watch Co.* v. *Commissioner*, 176 F. 2d 211, in considering the term "trust" as used in section 165 (a) the court said:

* * * The issue thus distilled from the complicated collection of statutes involved is the meaning of the word "trust" in Section 165 (a). That section must, of course, be interpreted in the light of the whole statutory scheme and of the purpose of Congress in enacting and amending the statute. "Trust" is not a term of art or of fixed content, and its meaning for the purposes of this section is not necessarily the same as under state law or as under other sections of the Internal Revenue Code. * * *

See also *555, Inc.*, 15 T. C. 671; *Crow-Burlingame Co.*, 15 T. C. 738.

Has petitioner established a pension trust within the meaning of section 165 of the pertinent statutes?

This record establishes that in 1933 petitioner's board of directors, with the approval of its stockholders, resolved to put into effect a pension plan known as a "Contributing Annuity Plan." It advised its employees of the purposes of the plan, as to its operation, of the obligations of the employer and employees as to the contributions to be made thereunder, and the rights, interests, and privileges of the employees under the plan. On December 27, 1933, petitioner entered into an agreement with Equitable for the administration of the plan, which covers 98½ per cent of petitioner's employees and does not discriminate in favor of any officer, stockholder or employee.

When an employee reaches the retirement age, Equitable is to apply sufficient of the funds to the purchase of an annuity for such retiring employee. Equitable, however, makes no commitment as to the sufficiency of the funds to purchase the annuities to be provided. Equitable keeps no records with respect to the individual employees and does not know the names or ages of the individual employees until immediately prior to their eligibility for retirement. Except in those instances where employees, about five years prior to retirement, have elected to have purchased for them a joint and survivor annuity, Equitable does not know the type of annuity which will be purchased for the employees until such employees are eligible for retirement. Equitable, from time to time, renders accounts to petitioner showing the amounts on deposit in the respective funds to purchase the annuities for the employees eligible for retirement, the amounts of interest credited, and the balance remaining in the funds.

Pursuant to the agreement with Equitable, petitioner has made periodic payments to Equitable and, although it can at any time withdraw these funds and place them with another administrator of the plan, no part of these payments or the income therefrom may be diverted for any purpose outside the plan or be recovered by petitioner prior to the satisfaction of all liabilities to the employees and their beneficiaries.

We think it is clear that in executing the agreement here in question the parties intended to and did in fact create a fiduciary and not a mere debtor and creditor or simple contractual relationship.

Our decision in *Reginald H. Parsons*, 15 T. C. 93, furnishes no authority for holding otherwise. We there held that sums paid by the taxpayer to provide paid-up annuities to certain employees in consideration of their past services were not deductible over a 10-year period as amounts transferred or paid into a pension trust within the meaning of section 23 (p) of the Internal Revenue Code. The facts basing that holding show that the taxpayer in 1940 paid the sum of

$11,592.37 for the purchase of *paid-up* annuities for 10 of his regular employees. Each employee personally made application for his own annuity and received a contract in his own name. It did not appear from the evidence that the taxpayer at any time prior to the actual purchase of the paid-up annuities irrevocably set aside any funds for that purpose or had adopted any definite plan. The recited facts clearly distinguish that case from the instant case. Here petitioner had a definite, detailed, formal plan in writing, to provide pensions *when* its eligible employees were retired. It made irrevocable contributions which were to be used to purchase annuities *when* the employee reached the retirement age. No immediate purchase of paid-up annuity policies was made or contemplated. Under the contract the funds could have been withdrawn from Equitable at any time and delivered to another administrator of the plan.

During the years 1934 to 1941, inclusive, petitioner claimed deductions on account of its payments to Equitable. Each such payment was apportioned over the following 10 years, pursuant to section 23 (p) of the Internal Revenue Code, and prior revenue acts. This treatment must have been on the ground that the contract we are now considering created such a pension trust.[2]

On the basis of the entire record, we conclude that petitioner has established the existence of a valid pension trust within section 165 (a) of the Internal Revenue Code as amended, and prior revenue acts.

The parties have stipulated that if the amounts paid to Equitable in the years 1933 to 1937, inclusive, on account of costs arising from services rendered prior to 1933, are apportioned over 10-year periods, the amounts of $299,572.44, $262,074.29, and $102,798.72 are allocable to the respective taxable years 1942, 1943, and 1944. We hold that such amounts constitute proper deductions in those years, and, therefore, sustain petitioner on the first issue.

The second issue is the respective amounts deductible by the petitioner in the taxable years 1943 and 1944 on account of deposits made with Equitable in accordance with its annuity plan, under the provisions of section 23 (p) as amended by the Revenue Act of 1942, section 162 (b).[3]

---

[2] Incidentally, all of those deductions—for 1934 to and including 1941—were allowed by the respondent, who makes no explanation for his present apparent change of this long-existing position.

[3] The material parts of section 23 (p), as amended by the Revenue Act of 1942, are as follows :

In computing net income there shall be allowed as deductions :

(p) CONTRIBUTIONS OF AN EMPLOYER TO AN EMPLOYEES' TRUST OR ANNUITY PLAN AND COMPENSATION UNDER A DEFERRED-PAYMENT PLAN.—

(1) GENERAL RULE.—If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under subsection (a) but shall be deductible, if deductible under subsection (a) without regard to this subsection, under this subsection but only to the following extent :

During the years 1943 and 1944 petitioner deposited with Equitable the respective amounts of $144,865.44 and $146,478.99, to cover the "normal cost" of the Equitable plan arising from services of petitioner's employees rendered subsequent to December 31, 1932. Petitioner claimed these respective amounts as deductions for those years under section 23 (p) (1) (A) (iii) (see footnote 3) and, as appears in the determinations of the deficiencies, respondent disallowed the entire deduction for 1943, and $10,256.56 of the amount thus claimed as a deduction for 1944.[4]

The respondent argues only that petitioner's "normal cost" for each of those years, 1943 and 1944, is "the amount that is reasonably necessary to complete the funding of all liability under the Plan." In other words, his position is that the surplus in the trust fund which

(A) In the taxable year when paid, if the contributions are paid into a pension trust, and if such taxable year ends within or with a taxable year of the trust for which the trust is exempt under section 165 (a), in an amount determined as follows :

(i) an amount not in excess of 5 per centum of the compensation otherwise paid or accrued during the taxable year to all the employees under the trust, but such amount may be reduced for future years if found by the Commissioner upon periodical examinations at not less than five-year intervals to be more than the amount reasonably necessary to provide the remaining unfunded cost of past and current service credits of all employees under the plan, plus

(ii) any excess over the amount allowable under clause (i) necessary to provide with respect to all of the employees under the trust the remaining unfunded cost of their past and current service credits distributed as a level amount, or a level percentage of compensation, over the remaining future service of each such employee, as determined under regulations prescribed by the Commissioner with the approval of the Secretary, but if such remaining unfunded cost with respect to any three individuals is more than 50 per centum of such remaining unfunded cost, the amount of such unfunded cost attributable to such individuals shall be distributed over a period of at least 5 taxable years, or

(iii) in lieu of the amounts allowable under (i) and (ii) above, an amount equal to the normal cost of the plan, as determined under regulations prescribed by the Commissioner with the approval of the Secretary, plus, if past service or other supplementary pension or annuity credits are provided by the plan, an amount not in excess of 10 per centum of the cost which would be required to completely fund or purchase such pension or annuity credits as of the date when they are included in the plan, as determined under regulations prescribed by the Commissioner with the approval of the Secretary, except that in no case shall a deduction be allowed for any amount (*other than the normal cost*) paid in after such pension or annuity credits are completely funded or purchased.

\* \* \* \* \* \* \*

(B) In the taxable year when paid, in an amount determined in accordance with subparagraph (A) of this paragraph, if the contributions are paid toward the purchase of retirement annuities and such purchase is a part of a plan which meets the requirements of section 165 (a) (3), (4), (5), and (6), and if refunds of premiums, if any, are applied within the current taxable year or next succeeding taxable year towards the purchase of such retirement annuities.

\* \* \* \* \* \* \*

(2) DEDUCTIONS UNDER PRIOR INCOME TAX ACTS.—Any deduction allowable under section 23 (q) of the Revenue Act of 1928 (45 Stat. 802), or the Revenue Act of 1932 (47 Stat. 182), or the Revenue Act of 1934 (48 Stat. 691), under section 23 (p) of the Revenue Act of 1936 (49 Stat. 1661), or the Revenue Act of 1938 (52 Stat. 464), or the Internal Revenue Code for a taxable year beginning before January 1, 1942, which under such; section was apportioned to any taxable year beginning after December 31, 1941, shall be allowed as a deduction for\ the years to which so apportioned to the extent allowable under such section if it had remained in force with respect to such year. [Emphasis added.]

[4] By amended answer respondent asks for an increased deficiency for 1944 on the ground that he erred in allowing too large a deduction for "normal cost" for that year.

arose in years prior to the effective date of the 1942 amendments must first be applied in reducing the amount required for the annuities arising out of the service for 1943 in determining the amount of the deduction for "normal cost" for that year, and, similarly, for 1944. Part of the pending deficiencies resulted from such application of this surplus.[5] Petitioner contends that respondent erred in so using this surplus. That presents the only question for decision. We agree with petitioner.

The issue is resolved by the meaning of "normal cost" as used in the controlling statute.[6] Also see *Saalfield Publishing Co.*, 11 T. C. 756, for background and history of this section.

The statute does not define "normal cost." The deductions under subsection 23 (p) (1) (A) (i) and (ii) are expressly restricted to the amount necessary to provide the remaining unfunded cost of liability under the plan. Petitioner, however, claims under subsection 23 (p) (1) (A) (iii). The deductions permitted under that subsection are "in lieu of" and are not limited by subsections (i) and (ii). *Saalfield* case, *supra*. And subsection (iii) contains no such limitation.

There is no apparent reason why the term "normal cost" should not be given its ordinary meaning. Webster defines "normal" as "according to, constituting, or not deviating from, an established norm, rule or principle; conformed to a type, standard or regular form; performing the proper functions; regular; natural." This definition of the adjective was approved in *Railroad Commissioner* v. *Konowa Operating Co.*, 174 S. W. 2d 605, 609, in its holding that the term meant "according to, constituting, or not deviating from, an established norm, rule or principle." "Cost" is the amount of money or its equivalent paid or given or charged or engaged to be paid or given for anything bought or taken in barter or services rendered. Webster's New International Dictionary. So, applying these definitions, "normal cost" for any year would mean the amount of money charged or required to be paid *normally* (as contrasted with *abnormally*) to

---

[5] In computing the contested deficiencies for 1943 and 1944 respondent apparently accepted the amount of $144,865.44 deposited with Equitable by petitioner in that year as having been deposited on account of normal cost of the plan for that year. Respondent also accepted the new stipulated figure of $155,122 as the surplus, as of January 1, 1943, that is, the amount of Premium Fund (B), in excess of the amount necessary to meet all the liabilities of Equitable under the plan, including those for annuities arising from the services rendered in that year. Since $155,122 exceeds $144,865.44 by the amount of $10,256.56, respondent apparently determined there was no "normal cost" of the plan for 1943. He then apparently accepted the amount of $146,478.99 deposited with Equitable in 1944 as having been deposited on account of "normal cost" of the plan for that year and reduced such amount by the $10,256.56, remaining in surplus at the beginning of January 1944, thus leaving $136,222.43 which respondent apparently determined was the amount deductible for "normal cost" of the plan for that year, and so allowed that sum.

[6] See footnote 3.

Equitable by petitioner to meet its liability under the contract for annuities arising from services in such year.

Section 23 (p) of the Internal Revenue Code as amended by the Revenue Act of 1942, as it appeared in the taxable years, was not retroactive. For 1942, petitioner seems to have claimed and was allowed to deduct 5 per cent of the aggregate compensation paid or accrued during that year for the benefit of all its employees under the plan, because this payment was made before September 1, 1942, and this payment is not in dispute. Section 162 (d) (1) (C) (i), Revenue Act of 1942.

Section 23 (p) (1) (A) (iii), under which the petitioner claims, permits the deduction, in the taxable year when paid, of "an amount equal to the normal cost of the plan, as determined under regulations prescribed by the Commissioner with the approval of the Secretary, plus, if past service or other supplementary pension or annuity credits are provided by the plan, an amount not in excess of 10 per centum of the cost which would be required to completely fund or purchase *such pension or annuity credits* as of the date when they are included in the plan, as determined under regulations prescribed by the Commissioner with the approval of the Secretary, except that in no case shall a deduction be allowed for any amount (*other than the normal cost*) paid in after *such pension or annuity credits* are completely funded or purchased. [Emphasis added.]" The statute thus places a limitation on the deduction for "past service or other supplementary pension or annuity credits" which were provided by the present plan, but explicitly excepts the "normal cost," [7] from the effect of that limitation.

Regulations 111, section 29.23 (p)–7,[8] issued under the authority of

[7] Here the past service annuity credits, as provided by the plan, had been completely funded before 1942, and no amount was claimed by petitioner for funding any annuity credits arising from those past service credits.

[8] REGULATIONS 111.

Sec. 29.23 (p)–7. PENSION AND ANNUITY PLANS—LIMITATIONS UNDER SECTION 23 (p) (1) (A) (iii).—Subject to the applicable general conditions and limitations (see section 29.23 (p)–4), under section 23 (p) (1) (A) (iii), in lieu of amounts deductible under the limitations of clause (i) and clause (ii), deductions may be allowed to the extent of limitations based on normal and past service or supplementary costs of providing benefits under the plan. "Normal cost" for any year is the amount actuarially determined which would be required as a contribution by the employer in such year to maintain the plan if the plan had been in effect from the beginning of service of each then included employee and if such costs for prior years had been paid and all assumptions as to interest, mortality, time of payment, etc., had been fulfilled. Past service or supplementary cost at any time is the amount actuarially determined which would be required at such time to meet all the future benefits provided under the plan which would not be met by future normal costs and employee contributions with respect to the employees covered under the plan at such time.

The limitation under clause (iii) for any taxable year is the sum of normal cost for the year plus an amount not in excess of one-tenth of the past service or supplementary cost as of the date the past service or supplementary credits are provided under the plan, all determined under regulations prescribed by the Commissioner with the approval of the

**52**

the statute, in defining "normal cost," as used in the statute, clearly supports the position of the petitioner. The regulation first provides that "* * * normal cost for any year is the amount actuarially determined * * *." This would seem to effectively exclude any adjustment to such "actuarially determined" figure unless allowed in some other language of the regulation, and assuming the requirement of such adjustment was within the authority granted to the respondent by the statute. It is the cost so determined "which would be required * * * in such year to maintain the plan if the plan had been in effect from the beginning of service of each then included employee and if such costs for prior years had been paid and all assumptions as to interest, mortality, time of payment, etc., had been fulfilled. * * *" That provision bars the Commissioner from adjusting this actuarially determined figure by any amount.

We think, therefore, that neither the statute nor the regulation defining "normal cost" authorizes or permits the adjustment of the actuarially determined figure of "normal cost" under the plan by any amount. This construction of the law and regulations is supported by the Report of the Senate Finance Committee with respect to the bill which later became the Revenue Act of 1942.[9] In connection with the amendments of section 23 (p) this report contains, *inter alia*, the statement that "normal cost in any year is the amount required by the insurance company for the annuity arising out of *that year's service*. [Emphasis added.]"

Secretary. For this purpose the normal costs may be determined by any generally accepted actuarial method and may be expressed either as (a) the aggregate of level amounts with respect to each employee covered under the plan, (b) a level percentage of payroll with respect to each employee covered under the plan, or (c) the aggregate of the single premium or unit costs for the unit credits accruing during the year with respect to each employee covered under the plan, provided, in any case, that the method is reasonable in view of the provisions and coverage of the plan, funding medium, and other applicable considerations. The limitation may include one-tenth of the past service or supplementary cost as of the date the provisions resulting in such cost were put into effect, but is subject to adjustments for prior favorable experience. See section 29.23 (p)–4. In any case past service or supplementary costs shall not be included in the limitation for any year when the amount required to fully fund or purchase such past service or supplementary credits has been deducted and no deduction is allowable for any amount (other than the normal cost) which is paid in after such credits are fully funded or purchased.

[9] *Under another class, in lieu* of the level amount or level percentage basis already referred to, the employer may elect to provide during each year of an employee's active employment the cost of the actual pension credit arising out of that year of employment. As that cost for a given amount of pension or annuity credit for a given employee increases as he becomes older, it is obvious that the cost is not distributed as a level amount or level percentage over the remaining future service, but as an increasing amount or percentage. Whether the aggregate amount or percentage for all employees increases, decreases, or remains unchanged from one year to another depends upon the effect of changes in personnel, etc., during the period in question. This particular method is used for most annuity plans under which the employer sets up an employee retirement plan under a master group annuity contract issued by an insurance company. In such case it is obvious that the *normal cost in any year is the amount required by the insurance company for the annuity arising out of that year's service.* [Emphasis added.] [S. Rept. No. 1631, 77th Cong., 2nd Sess., 1942–2 C. B. 608]

Respondent cites as authority for his contention the following excerpt from Regulations 111, section 29.23 (p)–5, as amended by T. D. 5666:

PENSION AND ANNUITY PLANS—LIMITATIONS UNDER SECTION 23 (p) (1) (A) (i).

\* \* \* \* \* \* \*

\* \* \* the amount reasonably necessary to provide the remaining unfunded cost of past and current service credits of all employees under the plan \* \* \* may be determined as the sum of (a) the unfunded past service cost as of the beginning of the year, and (b) the normal cost for the year, all determined by methods, factors, and assumptions appropriate as a basis of limitations under clause (iii). \* \* \*

It is to be noted, however, that this section of the regulation is construing subsection 23 (p) (1) (A) (i), whereas subsection (iii) is controlling here. Thus, aside from our doubt that the quoted regulation indicates an intention on the part of the respondent to lay down any such rule as that for which he now contends, no limitation of the deductions under subsection (i) can limit the deductions allowable under subsection (iii). *Saalfield* case, *supra*.

The fallacy of the respondent's position is apparent. It is this. Despite the undoubted increase in risks, the liability of Equitable to meet which arose under the plan during 1943, he has determined that there was no "normal cost" for the assumption of these increased liabilities.

It may be well at this point to consider just what constituted this "surplus" which respondent seeks to use in computing the "normal cost" for the years 1943 and 1944. In prior years, petitioner made contributions to the trust, as part of the plan. Deductions with respect to these contributions were legally computed, so far as the record reveals. They were allowed or are being allowed under the amortization provisions of section 23 (q) of the Revenue Act of 1932, and similar provisions of succeeding revenue acts. Section 23 (p) (2) of the Internal Revenue Code, as added by the Revenue Act of 1942. In some years the amounts of these contributions were proved by experience to exceed the cost of the risk maturing in such year. In other years such contributions were insufficient for that purpose. As a result, this book "surplus" arose. It is a variable figure. In future years it may be increased, decreased, or eliminated, and any part of such surplus which may be later restored to petitioner upon the discontinuance of the pension plan and the payment of all its obligations would be an income-determining factor to petitioner in the year of that restoration. See *White Bros. Co.* v. *Commissioner*, 180 F. 2d 451, certiorari denied 340 U. S. 825.

The meaning of "normal cost" as used in the statute is a question of law. The correct computation of "normal cost" within that mean-

ing is a question of fact. It is an actuarial computation resting on certain factors and assumptions. See Regulations 111, section 29.23 (p)–4.[10] These factors and assumptions may vary from year to year—based on experience.

In determining the deficiency, the respondent might have actuarially computed "normal cost" by using factors and assumptions other than those basing the computation of the petitioner. But, apparently, he did not do this. (See footnote 5, *supra*.) And he offered no evidence at the hearing as to any actuarial computation of "normal cost" for either of the taxable years 1943 and 1944.

The uncontradicted testimony of a qualified insurance actuary at the trial, which was received without objection, was that, computed by the use of the assumptions and factors prescribed by the regulations, the normal cost of the plan for the year 1943 was $159,787, and for 1944 $159,511. Accordingly we have found the facts in accordance with that testimony.

The amounts deposited by petitioner in those years to meet the respective costs of the plan for those years were each less than such respective normal costs. Therefore, under section 23 (p) (1) (A)

---

[10] REGULATIONS 111.

Section 29.23 (p)–4. CONTRIBUTIONS OF AN EMPLOYER TO OR UNDER AN EMPLOYEES' PENSION TRUST OR ANNUITY PLAN THAT MEETS THE REQUIREMENTS OF SECTION 165 (a)— APPLICATION OF SECTION 23 (p) (1) (A)—IN GENERAL.—

* * * * * * *

In determining costs for the purpose of limitations under section 23 (p) (1) (A), the effects of expected mortality and interest must be discounted and the effects of expected withdrawals, changes in compensation, retirements at various ages, and other pertinent factors may be discounted or otherwise reasonably recognized. A properly weighted retirement age based on adequate analyses of representative experience may be used as an assumed retirement age. Different basic assumptions or rates may be used for different classes of risks or different groups where justified by conditions or required by contract. In no event shall costs for the purpose of section 23 (p) (1) (A) exceed costs based on assumptions and methods all of which are reasonable in view of the provisions and coverage of the plan, funding medium, reasonable expectations as to the effects of mortality and interest, reasonable and adequate regard for other factors such as withdrawal and deferred retirement, whether or not discounted, which can be expected to reduce costs materially, reasonable expenses of operation, and all other relevant conditions and circumstances. In any case, in determining the costs and limitations an adjustment shall be made on account of any experience more favorable than that assumed in the basis of limitations for prior years, and, unless such adjustments are consistently made every year by reducing the limitations otherwise determined by any decrease in liability or cost arising from experience in the next preceding taxable year more favorable than the assumed experience on which the costs and limitations were based, the adjustment shall be made by some other method approved by the Commissioner.

[Petitioner contends that, if valid at all, the last sentence of the quoted portion of this regulation applies not to "normal cost" but only to the computation of the deduction of the cost of past service credits, which is not here involved. The respondent contends that this provision is valid but says that it is inapplicable because, according to his theory, the determination of "normal cost" by deducting surplus therefrom would automatically eliminate the applicability of this provision. It might be argued that the "adjustment" mentioned in the sentence, if meant to apply to the computation of "normal cost," means only an adjustment to the factors and assumptions used in the computation. In any event, if the provision be contradictory to our conclusion here that "normal cost" is not to be adjusted by any amount, it is invalid as in conflict with the statute and the regulation defining "normal cost" quoted in footnote 8.]

'iii), *supra*, petitioner's deductions are limited to the amounts actually paid to the trust in the taxable years 1943 and 1944, to wit, for 1943, $144,865.44, and for 1944 $146,478.99.

The respondent erred in disallowing deductions for the taxable years 1943 and 1944 in any part of such amounts.

The parties have stipulated that the depletion deductions to which petitioner is entitled for the taxable years 1942, 1943, and 1944 are dependent on our decision as to the other issues presented. Therefore the amount of the depletion deductions will be computed in accordance herewith in the recomputations under Rule 50.

Reviewed by the Court.

*Decision will be entered under Rule 50.*