**COMMUNITY SERVICES, INCORPORATED**

**v.**

**The UNITED STATES.**
**No. 100–67.**

United States Court of Claims.

March 20, 1970.

William L. Sollee, Rockville, Md., for plaintiff, Richard B. Barker, Washing-

ton, D. C., attorney of record. Ivins, Phillips & Barker, Washington, D. C., of counsel.

Frances M. Foltz, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant, Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

COLLINS, Judge.

This is an income tax refund action by plaintiff to recover the sum total of $12,-558.08, which was illegally collected from plaintiff by defendant for the taxable years 1962 and 1963, plus statutory interest from date of payment. The case is before this court on the agreed upon stipulation of facts. Since the facts have been stipulated, they will be summarized here only to the extent necessary to explain the basis of the court's decision.

Plaintiff is an eleemosynary corporation organized under the laws of South Carolina with its principal office in Graniteville, South Carolina. At all times pertinent to the question in issue, plaintiff was engaged in the operation of a canteen refreshment (in plant feeding) service for the benefit of the employees of the Graniteville Company and the people of the communities in which the mills of such company were operated. Plaintiff is an accrual basis taxpayer and files its federal income tax returns on a fiscal year basis ending on the Saturday nearest the last day of each calendar year.

On October 25, 1962, a committee was appointed by plaintiff's Board of Direc-

tors to set up a retirement plan for the benefit of plaintiff's employees. On December 21, 1962, plaintiff, through its committee, adopted a profit-sharing retirement plan for its employees, effective retroactively to January 1, 1962. Under this plan, plaintiff agreed to contribute 25 percent of its net income for each year or the maximum allowable deduction for federal income tax purposes.[1] Employees were not required or permitted to contribute to the plan. All employees who had completed at least 12 months of continuous service and were 21 years of age on each January 1 were to be eligible for coverage under the new plan. The contributions were to be allocated annually to the individual accounts of the eligible employees on the basis of years of service and amount of compensation. The interest of an eligible employee would vest upon the happening of (1) retirement at age 65; (2) death; (3) total and permanent disability; or (4) early retirement at age 55 with at least 10 years of service and consent of plaintiff. Benefits normally would be paid through the purchase of an annuity for life although optional modes of payment were available. The plan was to be administered by a committee of five serving at the pleasure of plaintiff's Board of Directors, and it could be modified or terminated by plaintiff "for adequate reason." In addition, the terms of the plan along with any other necessary provisions were to be incorporated in the deposit administration group annuity contract between plaintiff and the Life Insurance Company of Virginia, which company was to manage and disburse the funds of the plan. In the event of any discrepancy between the plan and the contract, the latter would control. Both the plan and the policy were to qualify under sections 401(a), 403, 501(a),[2] and other applica-

---

1. In this particular case the maximum allowable deduction would be "an amount not in excess of 15 percent of the compensation otherwise paid or accrued during the taxable year to all employees under the * * * profit-sharing plan." Int.Rev.Code of 1954, § 404(a) (3) (A).

2. Section 401(a) sets down the general qualifications which must be met in order for there to be a valid stock bonus, pension, or profit-sharing plan. Section 403 deals with the taxability of employee annuities. Section 501(a) provides for an exemption from taxation for an organiza-

ble provisions of the Internal Revenue Code of 1954 (hereinafter referred to as the 1954 Code).

On December 21, 1962, the Life Insurance Company of Virginia issued a deposit administration group annuity contract to plaintiff with the effective date being January 1, 1962. Under this contract plaintiff would make its annual premium payment (usually 25 percent of net income) to the Life Insurance Company of Virginia, which would credit 97½ percent of this payment to a premium deposit fund, which earned interest at the rate of 3 percent per annum. The insurance company would then allocate to the reserve accounts of the eligible employees a portion of the yearly premium payment as determined by a formula. The amounts in the premium deposit fund were not to be held separately, but were to be commingled with the insurance company's general corporate funds. In addition, these funds could not be withdrawn by plaintiff but could only be applied to the purchase of retirement annuities by an employee. Upon death or retirement of an employee, the amount in the employee's account would be removed from the premium deposit fund in order to purchase a retirement annuity. If an eligible employee terminated his employment for any reason other than retirement, death, or disability, his rights under the policy would be forfeited.

The deposit administration contract could be amended or changed by mutual agreement of plaintiff and the insurance company except that no amendment or change could be made which would permit the use of the deposit fund except for the exclusive benefit of the employees or their beneficiaries. The contract could be terminated either on the election of plaintiff or as the result of plaintiff's failure to pay premiums. In the event of termination, the premiums already paid to the insurance company could be applied to the purchase of a cash refund annuity for the employees, or plaintiff, at its election, could receive 97.44 percent of the premium deposit fund.[3] If plaintiff made this election, the insurance company was not obliged to question plaintiff's authority to receive the funds, nor the manner in which they were to be applied, nor the particular reserve accounts which were being withdrawn.

On December 26, 1962, plaintiff sent a letter to its employees announcing the adoption of the retirement plan, but not enumerating any of the details of the plan. On December 31, 1962, plaintiff sent a letter to the Pension Trust Adviser, District Director of Internal Revenue, Columbia, South Carolina, requesting qualification of its retirement plan under sections 401(a) and 501(a) of the 1954 Code. Meanwhile, pursuant to the terms of the plan, plaintiff paid to the insurance company the sum of $8,571.28, which represented 25 percent of plaintiff's net income for fiscal year 1962. And on January 17, 1964, plaintiff paid to the insurance company the sum of $12,403.12, which represented 25 percent of plaintiff's net income for fiscal year 1963. On its income tax returns for the years 1962 and 1963, plaintiff deducted the above-mentioned sums as contributions to a qualified profit-sharing plan.[4]

---

tion which qualifies as a trust under § 401(a).

3. It should be noted that plaintiff has never exercised this right to terminate the contract and remove the premium deposit fund from the insurance company.

4. The deductions were made under the authority of Int.Rev.Code of 1954, § 404(a), which provides in part:

"If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan * * * such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income); but, if they satisfy the conditions of either of such sections, they shall be deductible under this section, * * *."

On November 18, 1964, a formal trust agreement was executed by and between plaintiff and five individuals as trustees, with the approval of the insurance company. This agreement provided that the contract between plaintiff and the insurance company would be revised so as to be a contract between the trustees and the insurance company. Also all contributions made by plaintiff would be made to the trustees who, in turn, would pay them over to the insurance company. The sole beneficiaries of the trust would still be the plaintiff's employees, and the trust *res* would be the contract between plaintiff and the insurance company. The trust would continue in existence as long as the retirement plan remained in effect. On December 17, 1964, plaintiff, with the consent of the insurance company, amended the deposit administration contract so as to provide for a graduated vesting schedule and a new method of reallocating forfeitures. The formal trust agreement was made effective as of December 1, 1962, while the amendment was given an effective date of January 1, 1962. On November 24, 1965, the District Director of Internal Revenue, Columbia, South Carolina, issued a determination letter that plaintiff's retirement plan, as amended on December 17, 1964, together with the formal trust agreement of November 18, 1964, constituted a qualified profit-sharing plan and trust under the provisions of sections 401(a) and 501(a) of the 1954 Code. This determination letter was made effective as of January 1, 1964.

On February 21, 1966, the Commissioner of Internal Revenue ruled that the amounts contributed by plaintiff to its retirement plan for fiscal years 1962 and 1963 were not deductible on the ground that said contributions were not paid to a "trust" as required by section 401(a) of the 1954 Code. Thereupon, the Commissioner asserted deficiencies in the amounts of $5,290.42 ($4,457.07 tax plus $833.35 interest) for 1962 and $7,267.66 ($6,449.62 tax plus $818.04 interest) for 1963. These amounts were paid by plaintiff, who then filed timely claims for refund of the taxes and the interest, plus statutory interest as prescribed by law. Plaintiff's claims were rejected by the Commissioner on November 18, 1966, and, as a result, plaintiff filed this suit on April 5, 1967, seeking to recover the total amount of tax ($10,-906.69) unlawfully assessed by the Commissioner, plus the interest ($1,651.39) collected thereon, plus statutory interest from the date of payment on May 23, 1966.

The two main issues that must be decided in respect to this case are: (1) whether, in setting up the profit-sharing plan, plaintiff succeeded in establishing a valid trust; and (2) whether the trust was irrevocable so as to prevent the diversion of the trust funds to a use other than for the exclusive benefit of the employees.

The question of whether a trust actually existed in this case appears to be relatively easy to decide. There are several basic elements necessary in order to have a valid trust—such as a trust *res* or property, a beneficiary, a trustee (not absolutely necessary since one can be appointed by the court), a fiduciary relationship between trustee and beneficiary, and an intent to create a trust. Restatement (Second) of Trusts § 2 (1959) defined a trust as a "fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it." *See* A. Scott, The Law of Trusts § 2.3 (3d ed. 1967).

In the case at hand, it is clear that plaintiff established the Life Insurance Company of Virginia as the trustee or guardian of the contributions which plaintiff was to make under the plan. The money contributed by plaintiff was the trust *res,* and the plaintiff's employees were the beneficiaries of the trust. It is also clear that the Life Insurance Company of Virginia was holding the

funds for the benefit of plaintiff's employees since it had certain duties and obligations in respect to these funds, such as setting up employees' accounts and providing for the purchase of retirement annuities. Consequently, it would appear obvious that the insurance company was in the position of a fiduciary in regard to both the trust property and plaintiff's employees. The question of whether plaintiff intended to create a trust can best be answered by noting that plaintiff stipulated in both the plan and the contract that the plan was to qualify under section 401(a) of the 1954 Code, which specifically calls for the creation of a trust.

Defendant's main argument relating to the existence of a trust is that plaintiff could not have intended to create a trust in light of the statement in the contract that the accumulated funds were not to be deemed to be impressed with a "separate trust." However, when read in context, it can be seen that the parties only intended the funds not to be held by the insurance company in a trust separate from the other funds which it held. Instead, they preferred that the funds be held as part of the insurance company's general corporate funds and commingled therewith. The fact that the contract was worded in terms of a "separate trust" automatically implies that there was to be a trust but just not a separate one.

The fact that plaintiff's funds were to be commingled with the general corporate funds of the trustee likewise would not prevent the creation of a valid trust. For instance, the Tax Court in South Penn Oil Co. v. Commissioner, 17 T.C. 27, 45 (1951), specifically held that the fact that the Equitable Life Assurance Society of the United States commingled the funds contributed by the taxpayer with its own funds did not destroy their identity as trust funds since they were segregated and identified on the books of Equitable. *See* Restatement (Second) of Trusts § 179, comment *f* at 388 (1959).

■■ In addition, it should be pointed out that it is not necessary to use express or specific words to create a trust. In Hibbard, Spencer, Bartlett & Co. v. Commissioner, 5 B.T.A. 464 (1926), it was decided that all the elements of a valid pension trust were present (including intent) even though no express words of trust were used. The Board determined that there were many times when such words were not necessary. *See* Colton v. Colton, 127 U.S. 300, 8 S.Ct. 1164, 32 L.Ed. 138 (1888). Instead the Board stated: "Our conviction is strengthened by the subsequent acts of the parties. * * * The trust has functioned for eighteen years to the apparent satisfaction of all concerned. It is vain to say that no trust existed." Hibbard, Spencer, Bartlett & Co. v. Commissioner, *supra* at 472. Consequently, the mere fact that plaintiff in this case did not use any specific words of trust or refer to the insurance company as trustee will not be sufficient reason to find the nonexistence of a valid trust. We find, instead, that plaintiff was successful in forming a valid profit-sharing plan whereby it would make annual contributions to the Life Insurance Company of Virginia to be held by that company in trust and for the exclusive benefit of plaintiff's employees or their beneficiaries.

The second main issue that needs to be decided is the one regarding the diversion of the trust funds to a use other than for the exclusive benefit of the employees. Section 401 of the 1954 Code specifically provides:

(a) Requirements for qualification. —A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—

* * * * * *

(2) if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with

respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be (within the taxable year or thereafter) used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries; * *

Defendant's main argument in this respect is that, even if there was a valid trust, plaintiff is not entitled to a deduction for its contributions because the trust was not irrevocable. In other words, defendant claims that the possibility existed under the plan in 1962 and 1963 for plaintiff to recover the funds it contributed under the plan and divert them to its own use. Defendant bases this claim primarily on the provision in the deposit administration contract which allows plaintiff to terminate the contract at its election and receive 97.44 percent of the premium deposit fund. Defendant feels that this provision violates the spirit of section 401(a) (2) as exemplified by the applicable Treasury Regulations. For example, section 1.401-2(a) (2) (1964) of the Regulations provides:

> As used in section 401(a) (2), the phrase "if under the trust instrument it is impossible" means that the trust instrument must *definitely and affirmatively* make it impossible for the nonexempt diversion or use to occur, *whether by operation or natural termination of the trust, by power of revocation or amendment,* * * *. (Emphasis supplied by defendant.)

In addition, section 1.401–2(b) (2) (1964) of the Regulations states:

> * * * *It must be impossible for the employer* * * * *to recover any amounts* other than such amounts as

remain in the trust because of "erroneous actuarial computations" after the satisfaction of all fixed and contingent obligations. *Furthermore, the trust instrument must contain a definite affirmative provision to this effect,* * * *. (Emphasis supplied by defendant.)

Thus, defendant contends that the failure of plaintiff to definitely and affirmatively state in the contract that it was unlawful to divert the trust funds to its own use upon termination should be a fatal defect causing the trust to be disqualified under section 401(a) (2). Furthermore, the fact that the plan does not provide for the vesting in the employees of the amounts already contributed by plaintiff, upon termination, should prevent plaintiff from obtaining its claimed deductions.[5] *See* Rev.Rul. 56–596, 1956–2 Cum.Bull. 288; Rev.Rul. 55–186, 1955–1 Cum.Bull. 39.

We agree with defendant that if it were possible for plaintiff to terminate the trust and recover the funds for its own use, then clearly such a possibility would disqualify the trust. However, we do not agree that such a possibility ever existed in this case. Plaintiff specifically provided in the contract that the amounts accumulated in the premium deposit fund could not be withdrawn by plaintiff and were to be used only for the purposes described therein. In addition, the contract allowed for changes or amendments as long as they were mutually agreed upon by plaintiff and the insurance company, but *"no amendment or change [could be] made which would permit the use of the Premium Deposit Fund except for the exclusive benefit of the Members, former Members, or their beneficiaries."* (Emphasis added.) The mere fact that plaintiff

---

5. Defendant claims that had section 401(a) (7) of the 1954 Code been in effect during the years 1962 and 1963, there would have been no doubt but that plaintiff's plan would have been disqualified. Section 401(a) (7) reads as follows:
 "A trust shall not constitute a qualified trust under this section unless the plan of which such trust is a part provides that, upon its termination or upon complete discontinuance of contributions under the plan, the rights of all employees to benefits accrued to the date of such termination or discontinuance, to the extent then funded, or the amounts credited to the employees' accounts are nonforfeitable. * * *"

could terminate the contract and receive 97.44 percent of the funds should not by itself cause the plan to be disqualified. Instead the all important factor is whether, upon termination, plaintiff could divert the trust funds to its own use or to a use other than for the benefit of the beneficiaries. We feel it is clear that, even had plaintiff terminated the plan and withdrawn the funds, it still would have been bound by the contract to apply the funds exclusively to the use of the beneficiaries of the plan.

Plaintiff would have been prevented from diverting the trust funds to its own use, first, as the result of the provision which states that no amendment or change can be made which would permit the use of the funds except for the exclusive benefit of the employees or their beneficiaries, and, second, as the result of the clause providing that "[t]he Plan and the Contract shall qualify under the provisions of Sections 401(a), 403, 501(a) and other applicable provisions of the Internal Revenue Code." This incorporation by reference of section 401(a), which includes of course section 401(a) (2), conclusively establishes that it would have been a violation of the contract for plaintiff, at anytime, to have diverted the trust funds to its own use. Admittedly, plaintiff failed to specifically state what would happen to the trust funds upon a voluntary termination, but we do know, for certain, based on the incorporation by reference of section 401(a) (2), that the funds could only lawfully have been used for the exclusive benefit of the employees. Thus, we feel that there is little substance to the contention by defendant that the trust could be revoked by plaintiff and the funds used by plaintiff for any purpose it desired. Instead, we feel that the trust was irrevocable and that it qualified under section 401 (a) since the plan and contract specifically provided, either directly or through incorporation by reference, that there was no way in which any part of the corpus or income could be used for or diverted to purposes other than for the exclusive benefit of the employees or their beneficiaries.

We will readily admit that the profit-sharing plan as it was drafted in 1962 and 1963 is not a model of perfection, and we do not begin to recommend it as such. Instead, we take note of the fact that the plan apparently was very hastily and very poorly put together. However, despite the careless drafting, we do not feel that the plan was such that it should not qualify as a profit-sharing plan under section 401(a). We are convinced that plaintiff acted in complete good faith and with the best intentions of setting up a valid retirement plan for its employees. This feeling has since been substantiated by the subsequent conduct of plaintiff and its continuation of the plan.[6] A decision for defendant at this time, withholding the claimed deductions, would only cause harm to the beneficiaries of the plan in that the amount of plaintiff's contributions would be proportionately less.[7]

---

6. We are referring specifically to the fact that in 1964 plaintiff executed a formal trust agreement and amended the deposit administration contract. In 1965 plaintiff received a determination letter that the retirement plan as amended constituted a qualified profit-sharing plan. In addition, it is noted in the stipulation of facts that plaintiff has never exercised its right to terminate the contract and receive 97.44 percent of the premium deposit fund from the insurance company. See note 3 *supra.*

7. Plaintiff's counsel also pointed out at oral argument that the amounts distributed to an employee under a retirement plan which qualifies under section 401(a) and is exempt from tax under section 501(a) will normally be taxed to the beneficiary at capital gains rates. Int.Rev.Code of 1954 § 402(a) (2). However, if the retirement plan fails to so qualify and be exempt, then distributions made to employees shall be taxed as ordinary income. Consequently, this is another way in which plaintiff's employees might be hurt should the plan in question not qualify under section 401(a).

We hold, therefore, that plaintiff's retirement plan and contract with the Life Insurance Company of Virginia constituted a qualified plan under section 401 (a) of the 1954 Code, and that plaintiff's contributions to this plan in fiscal years 1962 and 1963 are deductible under section 404(a).[8] Judgment is hereby entered for plaintiff in the amount of $10,906.69, plus $1,651.39 interest collected thereon by the Commissioner, plus statutory interest as provided by law from the date of payment on May 23, 1966.

LARAMORE, Judge (dissenting):

I respectfully dissent.

The pertinent Code section and Treasury Regulation sections already have been set out, with appropriate emphasis, in the court's opinion above. I am of the view that neither the letter, nor the spirit, of the rules contained in these sections approves an arrangement, such as the one now under consideration, which exhibits the following type of language:

> * * * [O]n the Plaintiff's election, it could receive 97.44% of the premium deposit fund. If the Plaintiff made this election, the Insurance Company was under no obligation to question the Plaintiff's authority to receive the funds, nor the application of the amounts paid to Plaintiff, nor to determine which employee reserve accounts were being withdrawn.

It has been pointed out that plaintiff never exercised this option. This fact, when contrasted with the apposite tax standard, has, or should have, little bearing on the question before us. It has been further pointed out that, had plaintiff exercised its option, the employee-beneficiaries through court action could have enjoined plaintiff's free use of the funds. *Perhaps*, they could have. But, it is difficult to believe that an arrangement so lacking in certainty, and so remote in its potential enforcement, is of the kind intended to qualify under the emphasized *cautionary* wording of section 401(a) (2) and the regulations thereunder.