**Ellen MOOSE, et al.,
Plaintiffs-Appellants,**

**v.**

**UNITED STATES of America, et al.,
Defendants-Appellees.**

**No. 80–4373.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 14, 1981.

Decided April 19, 1982.

Donald K. Pope, Reno, Nev., for plaintiffs-appellants.

Maria Iizuka, Washington, D. C., argued, for defendants-appellees; B. Mahlon Brown, U. S. Atty., Reno, Nev., on brief.

Before PREGERSON and BOOCHEVER, Circuit Judges, and HALBERT,[*] District Judge.

PREGERSON, Circuit Judge:

Appellants are Indian children, members of the Southern Paiute tribe, who assert that the federal government has misman-

---

[*] The Honorable Sherrill Halbert, Senior District Judge for the Eastern District of California, sitting by designation.

aged their share of a fund Congress appropriated in 1965 to satisfy a judgment in favor of the tribe. Appellants say that the government at times paid no interest on their share of the fund, at other times paid interest at less than the maximum allowable rate, and since 1972 has allowed a bank to invest the money in securities not guaranteed as federal law requires. Appellants characterize this conduct as a breach of trust obligations for which damages can be awarded under the Tucker Act, 28 U.S.C. § 1346(a)(2).[1] The government's reply is that the fund in question is not held in trust for the minors, so that no breach of trust could have occurred and no Tucker Act jurisdiction exists. The district court agreed and dismissed appellants' claim for damages. It also dismissed the related claim for mandamus relief, holding that no ministerial duties were owed to appellants. Appellants appeal from the dismissal of their complaint. Because we conclude that jurisdiction does exist over appellants' claim for damages, we reverse and remand.

## FACTS

In January 1965, the Indian Claims Commission entered a judgment against the United States to compensate the Southern Paiute Tribe for the loss of its aboriginal homelands during the second half of the nineteenth century. Three months later, Congress appropriated some $7.2 million to pay this judgment.[2] The money was turned over to the Secretary of the Interior on May 12, 1965 and deposited in the federal Treasury.

In October 1968, Congress enacted the Southern Paiute Distribution Act [hereinafter "Distribution Act"], Pub.L. 90-584, 82 Stat. 1147. This statute required the Interior Secretary to prepare a roll of Southern Paiute tribal members, to apportion the judgment fund among specified groups of tribal members, and to deposit or distribute those groups' portions of the fund in specified ways. In particular, section 6 of the Act—at issue here—specified that sums payable to Southern Paiute minors "shall be paid in accordance with such procedures as the Secretary determines will best protect their interests, including the establishment of trusts."

The judgment fund was held in the United States Treasury from May 12, 1965 until March 28, 1966, earning 4% interest. From March 28, 1966 until March 5, 1971, the money was invested outside the Treasury. It was again deposited in the Treasury, at 4% interest, from March 5, 1971 until March 31, 1971. From April 1, 1971 until June 6, 1972, the fund earned no interest.

The adult tribal members received their shares (about $7500 each) on June 16, 1971. On June 6, 1972, the Secretary of the Interior entered into an agreement with the Valley Bank of Nevada, under which the bank was to hold as trustee the Southern Paiute minors' portion of the judgment fund. About $1.2 million was thus deposited with Valley Bank. Appellants allege that the bank invested the funds in common stocks and bonds that decreased in value.

Appellants, several Southern Paiute minors, filed the instant class action on April 8, 1977, on behalf of all 160 Southern Paiute minor beneficiaries of the judgment fund. In essence, appellants alleged that the government breached both its fiduciary duties as the trustee of the minors' portion of the judgment fund and duties imposed by statutes dealing with Indian trust

---

1. This statute gives the district courts concurrent jurisdiction with the Court of Claims over any:

   civil action or claim against the United States, not exceeding $10,000 in amount, founded upon either the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

2. The Second Supplemental Appropriations Act, Pub.L. 89-16, Title IV, 79 Stat. 108, appropriated approximately $31.4 million to pay various judgments against the United States that were enumerated in congressional documents. The Southern Paiute judgment was one of these. *Whiskers v. United States*, 600 F.2d 1332, 1333 n.2 (10th Cir. 1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980).

funds.[3] The conduct alleged to have breached these duties was the failure of the government, at various times, to invest the funds at all; its failure, at other times, to invest them at the maximum allowable rates, and its permitting Valley Bank to invest the funds in improperly secured risks and to pay federal income tax on earnings from the investments. Appellants requested: (1) money damages equal to the difference between the current value of each minor's share and its value had the most advantageous allowable investments been made; (2) an injunction directing the government to cease all illegal investments; and (3) mandamus to compel government officials to calculate what the minors' shares would have been worth had proper investments been made and to terminate the Valley Bank trust and create a new trust. Jurisdiction was alleged under 28 U.S.C. § 1346(a)(2) (the district court portion of the Tucker Act) and § 1361 (mandamus jurisdiction of district courts). The district court, however, dismissed the action for lack of jurisdiction in May 1980. This appeal followed.

## DISCUSSION

■ The Tucker Act, which appellants contend grants the district court jurisdiction over their damages claim, is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398,

96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976).[4] Appellants must rely on some *other* federal law to create the substantive right—"the asserted entitlement to money damages depends upon whether any federal statute 'can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" *Id.* at 400, 96 S.Ct. at 954, *quoting Eastport Steamship Corp. v. United States*, 372 F.2d 1002, 1009 (Ct.Cl.1967).

Appellants contend that several statutes mandate compensation for the alleged mishandling of their fund. One is section 6 of the Distribution Act itself. Appellants argue that under this statute the United States held their fund as a trustee, so that the statute implicitly mandates compensation for breach of the trust obligations. Appellants also cite 25 U.S.C. §§ 159, 161a, and 162a. Sections 161a and 162a impose specific obligations on the United States with respect to funds that it holds in trust for Indians,[5] and appellants argue that the government breached these obligations and must compensate for this breach of trust. Section 159 requires the government to pay 6% interest on all funds held in the Treasury and "due to incompetent or orphan Indians."

We need not, and do not, reach the question whether section 159 has any application here.[6] As for sections 161a and 162a, their

---

**3.** The complaint cited 25 U.S.C. §§ 159, 160, 161, 161a, and 162a. In this appeal, only sections 159, 161a, and 162a are alleged to be applicable.

**4.** In *Testan* the Court was dealing with 28 U.S.C. § 1491, the Court of Claims portion of the Tucker Act, rather than with § 1346(a)(2), which is involved here. But the Court's reasoning applies with equal force to both sections. *Duarte v. United States*, 532 F.2d 850, 851 n.2 (2d Cir. 1976).

**5.** Section 161a requires the government to pay at least 4% interest on all funds that it holds in trust to the credit of Indian tribes and on which no other interest rate is specifically mandated. Section 162a applies to funds held by the government in trust for Indian tribes or for individual Indians; it authorizes depositing such funds in banks and investing them in government bonds or other securities as to

which the United States unconditionally guarantees both principal and interest.

**6.** Section 159 applies to funds "due to incompetent or orphan Indians." Since no allegation has been made that any of the minors are orphans, appellants must be assuming that the minors are all incompetent. But "incompetent" has various meanings, and at least in some contexts it does *not* automatically apply to minors. *See, e.g., Williams v. Hewitt*, 181 P. 286, 288 (Okl.1919) (minority not "incompetency" as used in statute protecting property interests of minor and incompetent Osage Indians). The word "incompetent" could, for example, mean "mentally incompetent"—which most minors are not—or "not legally recognized as competent to exercise full rights," which minors are. Since appellants have failed to explain why they believe the term "incompetents" as used in section 159 applies to the

application is explicitly limited to Indian trust funds. The crucial question, therefore, is whether the fund in controversy here is one that the United States holds in trust for the appellants.

We believe that the United States *does* hold the minors' portion of the Southern Paiute judgment fund in trust for the minors. Section 6 of the Distribution Act requires that the government deal with that fund so as to "best protect" the minors' interests. This language manifests Congress's intent that the government hold the judgment fund for the benefit of the minors, which is precisely the intent necessary to create a trust.[7] Explicit use of the word "trust," or any other particular language, is not necessary.[8] This general rule applies with perhaps greater than usual force to a situation where the United States holds funds for an Indian tribe, because of the traditional and repeated emphasis on the fiduciary nature of the United States-Indian relationship.[9] Indeed, where the United States holds funds for Indian tribes, a trust relationship exists unless there is explicit language to the contrary:

> [W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.

*Navajo Tribe v. United States,* 624 F.2d 981, 987 (Ct.Cl.1980).[10]

It is noteworthy that Congress has explicitly referred to another one of the judgment funds appropriated by the Second Supplemental Appropriations Act of 1965—the Ute fund—as a "trust fund."[11] The Southern Paiute fund was appropriated by the same 1965 act. Nothing in that act differentiates the Ute judgment fund from

---

class they represent, we decline to express any opinion as to its applicability.

**7.** In deciding whether a trust has been created, the crucial question is "whether the settlor manifested an intention to impose upon himself or upon a transferee of the property equitable duties to deal with the property for the benefit of another person." 1 A. Scott, *The Law of Trusts* § 24 (3d ed. 1967). Where a property owner declares that he holds the property for another's benefit, or transfers the property to another with directions to deal with it for a third person's benefit, courts have not hesitated to find that a trust was created. *Id.*

**8.** *See, e.g., Coleman v. Golkin, Bomback & Co., Inc.,* 562 F.2d 166, 169 (2d Cir. 1977) (corporation's agreement to hold 10% of stock option for employee's benefit created a trust); *In re Penn Central Transp. Co.,* 486 F.2d 519, 524 (3d Cir. 1973), *cert. denied sub nom. Baker v. Indiana Harbor Belt R. R.* and *Chicago & Northwestern Transp. Co. v. Baker,* 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974) (certain monies collected by one railroad were held in trust for others despite "failure to expressly designate the relationship as one of trust"); *Community Services, Inc. v. United States,* 191 Ct.Cl. 76, 422 F.2d 1353, 1356–57 (1970) (employer's contributions to insurance company for employees constituted a trust despite absence of specific words of trust).

**9.** In one of the earliest decisions on the Indians' status, John Marshall wrote that "[t]heir rela-

tion to the United States resembles that of a ward to his guardian." *Cherokee Nation v. Georgia,* 30 U.S. (5 pet.) 1, 17, 8 L.Ed. 25 (1831). The Supreme Court "has recognized the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people," *Seminole Nation v. United States,* 316 U.S. 286, 296, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942), and has cautioned that such dealings "should therefore be judged by the most exacting fiduciary standards." *Id.* at 297, 62 S.Ct. at 1054. The Court continues today to speak of Indians as " 'wards of the nation, dependent upon its protection and good faith.' " *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 208 n.17, 98 S.Ct. 1011, 1020 n.17, 55 L.Ed.2d 209 (1978), *quoting McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973).

**10.** The Court of Claims has recently reaffirmed this position. *American Indians Residing on the Maricopa-Ak Chin Reservation v. United States,* 667 F.2d 980, 1002 (Ct.Cl.1981); *Mitchell v. United States,* 664 F.2d 265, 270 (Ct.Cl. 1981).

**11.** 25 U.S.C. § 676a deals with what it refers to as "the trust fund belonging to the ... Ute Indians appropriated by the Second Supplemental Appropriations Act, 1965."

the Southern Paiute fund,[12] and it is therefore plausible to assume that the Southern Paiute fund was also intended to be a trust fund.

■ Furthermore, a statute enacted several years after the Distribution Act to establish a uniform procedure for distributing Indian judgment funds indicates a congressional understanding that *all* such funds are held in trust.[13] Section 7 of that statute—now 25 U.S.C. § 1407—states that "[n]one of the funds distributed per capita or held in trust under the provisions" of the statute are to be taxed. This language indicates that Congress regarded all undistributed Indian judgment funds as "held in trust." The Court of Claims has expressed the same opinion:

It is clear from past opinions of this court and of the Supreme Court, and from the actions of both Congress and the Executive Branch, that funds appropriated to Indians to satisfy judgments of the Indian Claims Commission or of this court, as well as funds produced by tribal activities, are, when kept in the Treasury, held in trust for the Indians.

*Cheyenne-Arapaho Tribes v. United States,* 512 F.2d 1390, 1392 (Ct.Cl.1975).[14]

We are aware that the Tenth Circuit has recently concluded that the Distribution Act did not create a trust, because it no-

where "indicated that the judgment fund in question was to be held in trust pending distribution." *Whiskers v. United States,* 600 F.2d 1332, 1335 (10th Cir. 1979), *cert. denied,* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980). *Whiskers,* however, is clearly distinguishable because it involved a different portion of the Distribution Act. Appellants there contended that section 1 of the Distribution Act, which required the government to prepare a roll of members of the Southern Paiute tribe, imposed a trust obligation that the government violated by making inadequate efforts to enroll eligible tribal members living in remote areas. Section 6 of the Act, which we find manifests Congress's intent to impose trust obligations on the government vis-a-vis the Southern Paiute minors, was not at issue in *Whiskers.*

■ The *Whiskers* court did state, however, that where Congress declares that the government holds funds in trust for Indians, it thereby waives sovereign immunity with respect to damage claims for breach of that trust. *Whiskers, supra,* 600 F.2d at 1335. We agree with this statement, which is simply an application of the general rule that a trustee can be held liable for losses caused by breach of trust

---

12. As explained in note 2 *supra,* the 1965 act simply appropriated one lump sum to satisfy a number of judgments listed in two congressional documents. Both the Southern Paiute fund and the Ute fund are listed in H.R.Doc. No. 113, 89th Cong., 1st Sess. 15 (1965), simply as "compensation for land," with nothing said about trust status for either fund.

13. The statute is the Act of October 19, 1973, Pub.L. 93–134, 87 Stat. 466 (codified at 25 U.S.C. §§ 1401–07). Prior to enactment of this statute, separate legislation—like the Distribution Act involved in the instant case—was required for the distribution of each Indian judgment fund.

14. Two of the previous decisions on which the Court of Claims relied imposed trust obligations on the government's handling of Indian funds, despite the absence of any explicit trust language in the statutes creating the funds. In *Seminole Nation v. United States,* 316 U.S. 286, 293–300, 62 S.Ct. 1049, 1053–1056, 86 L.Ed. 1480 (1942), the Court held that the govern-

ment's payment of funds owed to the Seminoles to the tribal council rather than to individual Indians could constitute a breach of trust. In reaching this decision the Court explicitly treated the funds as a "trust fund," *id.* at 293–94, 62 S.Ct. at 1053, although the treaty that mandated the payments nowhere used trust language. Treaty with the Creeks and Seminoles, August 7, 1856, 11 Stat. 699, art. VIII. In *Menominee Tribe v. United States,* 102 Ct.Cl. 555, 59 F.Supp. 137 (1945), the United States was held to have acted improperly in withdrawing money from a tribal Treasury account bearing 5% interest and replacing it by money in another tribal account bearing only 4% interest. The holding rested partly on the argument that the United States stood in a fiduciary relationship to the tribe, *id.* at 140–41, although the statutes at issue contained no explicit trust language. (The principal statute was the Act of June 12, 1890, ch. 418, 26 Stat. 146, § 3, which set up the 5% account.)

obligations.[15] We therefore conclude that since under section 6 of the Distribution Act the government holds the judgment fund in trust for the Southern Paiute minors, those minors may bring an action for money damages for breach of the trust obligations.

This conclusion in no way conflicts with *United States v. Mitchell,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980), in which the Court rejected contentions that the government had breached fiduciary obligations owed to the Quinault Indian Tribe and individual Indians by improperly managing timber resources on reservation land. *Mitchell* left open the question whether the general rule that a trustee is liable for damages caused by breach of trust applies against the United States. The Court explicitly declined to "consider whether, had Congress actually intended [the statute in question] to impose upon the Government all fiduciary duties ordinarily placed by equity upon a trustee, the Act would constitute a waiver of sovereign immunity." 445 U.S. at 542, 100 S.Ct. at 1354. Indeed, on remand, the Court of Claims specifically stated that the rule that "[a] trust normally entails the right to compensation for the trustee's breach" would be applied against the United States where the statute creating the trust "does not in any way suggest

otherwise." *Mitchell v. United States,* 664 F.2d 265, 271 (Ct.Cl.1981).

Moreover, *Mitchell* is distinguishable on its facts from the instant case. The actual holding in *Mitchell* was that the particular statute plaintiffs there relied upon created only a limited trust that did not include any duty to manage timber resources. Although the United States held the Indians' land in trust, Congress intended that the Indians, rather than the government, were to be responsible for managing that land. 445 U.S. at 542-43, 100 S.Ct. at 1354. No analogous holding is possible here. The United States held the minors' judgment fund, and it was never contemplated that the minors, rather than the government, take charge of the investment of that fund.[16]

Thus, we conclude that the United States holds the minors' portion of the Southern Paiute judgment fund in trust for the minors, and consequently that the United States has waived sovereign immunity with respect to claims for damages for breach of that trust.[17] On remand, the district court will have to determine whether the government's handling of the minors' judgment fund breached either the general standards to which trustees are held[18] or the more

**15.** G. G. Bogert & G. T. Bogert, *Handbook of the Law of Trusts* § 152, at 562 (5th ed. 1973). In particular, negligence or misconduct in investing trust funds can generate liability for money damages. G. G. Bogert & G. T. Bogert, *The Law of Trusts and Trustees* § 862, at 18–19 (2d ed. 1962). Damages for breach of this obligation may include compensation for any resulting loss in value of the trust estate, or for any profit the estate would have realized but for the breach. *Restatement (Second) of Trusts* § 205 (1959).

**16.** *Mitchell* is different from the instant case for a second reason. The Court in *Mitchell* based its finding that only a limited trust existed partly on the legislative history of the statute creating the trust, and on subsequent legislation. The Court interpreted these factors as indicating that Congress sought to achieve only limited goals by creating a trust status for Indian lands, and that imposing timber-management duties on the United States was not one of these goals. There does not appear to be any corresponding feature of the legislative histories of the statutes involved here that would

show that Congress meant to impose only limited management responsibility on the government during the time it held the Southern Paiute judgment fund.

**17.** The dissent observes that section 6 directs the Interior Secretary to adopt whatever procedures he determines will best protect the interests of the Southern Paiute minors, "including the establishment of trusts." It reasons that, the quoted language would be redundant if section 6 itself created a trust fund. We read that language, however, as authorizing the Secretary to place the minors' money in one or more private trust funds managed by banking or investment concerns (as was done in the instant case). That authorization does not conflict with our conclusion that the government itself held the entire fund as a fiduciary, charged with enforceable trust obligations.

**18.** "[T]he trustee is under a duty to make such investments as a prudent man would make of his own property having primarily in view the preservation of the estate and the amount and regularity of the income to be derived." 3 A.

specific duties that 25 U.S.C. §§ 161a and 162a impose on the management of Indian trust funds.[19]

In addition to damages, appellants seek to compel the defendant government officials to calculate what each minor's share would be worth had the most advantageous allowable investments been made, and to replace the Valley Bank trust with a new trust containing the corrected value of each minor's share. Appellants rely on 28 U.S.C. § 1361, which grants jurisdiction to the district courts "of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

Mandamus, however, is proper only where the claim its proponent seeks to enforce is clear and certain and the duty of the government official is ministerial and "so plainly prescribed as to be free from doubt." *Lee Pharmaceuticals v. Kreps*, 577 F.2d 610, 618 (9th Cir. 1978), *cert. denied*, 439 U.S. 1073, 99 S.Ct. 847, 59 L.Ed.2d 40 (1979); *Jarrett v. Resor*, 426 F.2d 213, 216 (9th Cir. 1970). That is not the situation here. If the government is held to have breached its trust responsibilities, it will be for the district court, in the first instance, to determine the corrected value of the minors' shares of the judgment fund. Moreover, we cannot say that the defendant government officials owe a "clear and certain" duty to terminate the trust with the Valley Bank and set up a new one. Even if the Valley Bank trust was administered under improper safeguards, it would seem that government officials have discretion to decide how to remedy the situation (e.g., they could revise the trust agreement but keep the bank as trustee). Therefore, we affirm that portion of the district court's judgment dismissing appellants' request for injunctive and mandamus relief.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

HALBERT, District Judge, concurring and dissenting:

While I concur fully in the majority's conclusion that the dismissal of plaintiffs' requests for mandamus and injunctive relief was appropriate, I dissent from its conclusion that Tucker Act jurisdiction is present in this case.

The sole issue on this appeal is whether the United States has waived sovereign immunity to suit. Since the Tucker Act, upon which this suit is based, is "only a jurisdictional statute," and "does not create any substantive right enforceable against the United States for money damages," *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976), it is necessary to look beyond the Tucker Act's grant of jurisdiction to find a separate statute that "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Id.* at 400, 96 S.Ct. at 954 (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1009 [Ct.Cl.1967] ). It is that statute that provides the necessary waiver of sovereign immunity. *See United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 1352, 63 L.Ed.2d 607 (1980).

I am in full agreement with the proposition that "a legislative declaration of trust status for a particular fund is itself a congressional mandate, fully consistent with the *Testan-Eastport* standard discussed above, that the United States assume financial responsibility for its failure adequately to perform its fiduciary obligations." *Whiskers v. United States*, 600 F.2d 1332, 1335 (10th Cir. 1979), *cert. denied* 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980). Because that declaration of trust status is, *ipso facto*, a waiver of sovereign immunity,

Scott, *The Law of Trusts* § 227, at 1805–06 (3d ed. 1967).

**19.** Aside from these specific statutes, we note that the Court of Claims has said that "[t]he standard of duty as trustee for Indians is not mere reasonableness, but the highest fiduciary standards." *American Indians Residing on the Maricopa-Ak Chin Reservation v. United States*, 667 F.2d 980, 990 (Ct.Cl.1981) (footnote omitted).

however, it "cannot be implied but must be unequivocally expressed." *See United States v. Mitchell, supra,* at 538 (quoting *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 [1969]).

I find no such unequivocal declaration that the Southern Paiute minors' share of the judgment fund was to be held in trust in this case. The conclusion of the majority to the contrary is based upon an unconvincing patchwork of analogy and implication. Even if each portion of the majority's analysis were persuasive, however, it could not support the finding that sovereign immunity is waived. *See id.* Nowhere does the majority profess to find the type of conclusive, unequivocal legislative declaration of trust that would justify its conclusion. This is not surprising, for no such declaration appears to exist.

The Tenth Circuit found that to be true in the case of *Whiskers v. United States, supra,* which is clear authority for the proposition that the Southern Paiute judgment fund is not held in trust. *Whiskers v. United States, supra,* at 1335. The plaintiffs in *Whiskers* sought damages for the government's alleged failure to enroll them as eligible recipients of the judgment fund under Section 1 of the Distribution Act. In holding that there was no jurisdiction to review the alleged breach of duty, the *Whiskers* court squarely held that neither the Appropriations Act nor the Distribution Act created a trust. *Id.* at 1335, 1336. The fact that the *Whiskers* court did not expressly discuss Section 6 of the Distribution Act, the section at issue in the instant case, is unimportant. Its conclusion that a violation of Section 1 was not actionable was based entirely on its finding that the Distribution Act did not create a trust. That holding therefore applies here to indicate that a violation of Section 6 is likewise not actionable because the allotted funds were not held in trust.

Independent examination of the language of Section 6 in an effort to find Congressional intent to create a trust reveals that the Tenth Circuit's conclusion was correct. Reading that section of the enactment "with that conservatism which is appropriate in the case of a waiver of sovereign immunity," *Mitchell v. United States,* 664 F.2d 265, 268 (Ct.Cl.1981) (quoting *United States v. Sherwood,* 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058 [1940]), no clear intent to create a trust is apparent. Section 6 merely provides that the sums due the Southern Paiute minors "shall be paid in accordance with such procedures as the Secretary determines will best protect their interests, *including the establishment of trusts.*" (Emphasis added). It is significant that Congress named "the establishment of trusts" as *one* method by which the Secretary could "best protect" the minors' interests. If Congress itself had intended to create a trust by enacting Section 6, the inclusion of language allowing the Secretary to establish trusts would be redundant.

The fact that the language regarding the establishment of trusts is couched in permissive terms is significant for another reason as well. The Secretary has been given unfettered discretion in the handling of the minors' share of the judgment fund. There is no clear indication what shall constitute proper management of the fund; similarly, it is difficult to tell what shall constitute mismanagement. Had Congress intended to create a trust, the Secretary's discretion would have been limited by 25 U.S.C. §§ 161a, and 162a, but since the creation of trusts has been left to the judgment of the Secretary, no enforceable duties have been prescribed. "No trust is created unless the settlor manifests an intention to impose enforceable duties." *Restatement (Second) of Trusts* § 25 (1959).

Although it is thus clear that the Distribution Act was not intended to create a trust, but merely to confer discretion upon the Secretary to handle and distribute the funds as he saw fit, the majority has proceeded to examine several other statutes and principles of law in the apparent quest for an implication or analogy that would

justify its conclusion. It is my position that neither implication nor analogy will support a finding of a waiver of sovereign immunity; furthermore, I also dispute the validity of each of the arguments relied upon.

It has often been said that the relationship of the United States to the Indians resembles that of a guardian to his ward, which is admittedly a fiduciary relationship. In the words of the *Whiskers* court: "This point is not without some appeal and, indeed, it is entirely accurate as a general proposition." *Whiskers v. United States, supra,* at 1337. Recognition of this truism is insufficient to imply the existence of fiduciary duties owed by the United States to the Indians in the absence of a clear legislative mandate to that effect, however. The *Testan-Eastport* requirement that a specific statute granting a substantive right to compensation in damages be found before sovereign immunity is waived cannot be satisfied by taking note of the protection afforded Indians by the United States. *Id.* As a panel of this court has stated:

> The Federal-Indian relationship has many times been said to resemble that of a guardian and ward. However, in the absence of some specific language to the

effect in a treaty, the legal obligations of a true guardianship do not prevail. We are therefore of the view that the consent of the United States to be sued ... cannot be predicated on the guardian and ward concept.

*Skokomish Indian Tribe v. France,* 269 F.2d 555, 560 (9th Cir. 1959) (footnotes omitted).[1]

Another general proposition relied on by the majority is the idea that Indian funds held or controlled by the federal government are always held in trust absent language to the contrary, and even if no mention of a trust or fiduciary relationship is made in underlying statutes. In this context, a presumption in favor of the existence of a trust relationship is tantamount to a presumption in favor of a waiver of sovereign immunity. Such a presumption derogates the long-established rule that such a waiver be clear and unequivocal, in that no affirmative statement of Congress would be required to subject the government to suit.[2] If the trust status of Indian funds is to be interpreted as granting a substantive right to damages for breach of fiduciary duties under *Testan,* it is necessary that there be a clear indication that Congress intended that status. No such indication is present in the

---

1. *Skokomish* was a trespass and quiet-title action brought by Indians who had acquired treaty rights to certain tidelands in the State of Washington. The tribe alleged that the State of Washington had conveyed certain rights in the land to defendants in violation of the treaty. The language quoted above is contained in the appellate court's affirmance of the district court's decision not to require the United States to join as a party plaintiff.

2. I have examined with care the decisions relied upon by the majority for this proposition, and I do not feel that they apply to this case in light of the position I have taken. Not only would application of those decisions to these facts constitute a presumption in favor of a waiver of sovereign immunity, it would represent an attempt to judicially legislate the creation of a trust relationship.

    The courts must use great care when Congressional intent is sought to be derived from other than the specific language of a statute, lest what professes to be mere rendering becomes creation. Where that language expresses a reasonably clear intent, or lack thereof, to create a certain result, that language must be

accepted without modification by resort to construction or conjecture. It is not within the judicial function of a court to supply omissions in a statute even though that which was omitted may have been omitted by oversight or inadvertence. Judicial conjecture as to what Congress may have intended by its omission of certain language is necessarily based on the result the court wishes to achieve.

    What the majority apparently wishes to achieve in this case is a waiver of sovereign immunity through the existence of a trust relationship. I am in sympathy with Judge Nichols of the United States Court of Claims when he states that such a finding is often nothing more than a "strong and clear wish on the judge's part." *See Mitchell v. United States,* 664 F.2d 265, 277 (Ct.Cl.1981) (Nichols, J. concurring and dissenting). The advisability or desirability of a liberal construction of sovereign immunity in the context of Indian judgment funds is not for the courts to determine. Along with Judge Nichols, "I cannot join in efforts to achieve this result by judicial fiat." *Id.*

case before us. The silence of Congress on the question cannot be read as granting the Southern Paiute minors the substantive right to recover damages on a breach of trust theory.

Nor is any clear indication of Congressional intent to create a trust present in the allegedly analogous statutes cited by the majority. As stated above, analogous authority does not provide the unequivocal language necessary for a waiver of sovereign immunity. Furthermore, neither of the statutes cited by the majority can be applied to the Southern Paiute judgment fund.

Title 25, United States Code, Section 676a governs distribution of the Ute Indian judgment fund, which was appropriated by the Second Supplemental Appropriations Act—the same act that appropriated the Southern Paiute fund. Section 676a expressly refers to the Ute fund as a "trust fund," although the Appropriations Act had made no such distinction. *Compare* 25 U.S.C. § 676a *with* H.R. 7091, 89th Cong., 1st Sess., reprinted in [1965] U.S. Code, Cong. & Ad. News 90, 111. Reference to the Ute fund as a "trust fund" is argued to indicate Congressional understanding that all Indian funds appropriated by the Second Supplemental Appropriations Act are held in trust.

Similarly, the enactment of Title 25, United States Code, Section 1407 is also relied upon as an indication that Congress implicitly assumed that all Indian funds were held in trust, since that statute provides that funds distributed per capita or held in trust are not to be taxed. Section 1407 is part of an enactment aimed at, *inter alia*, expediting the distribution of Indian judgment funds, H.Rep. 93–377, 93d Cong., 1st Sess., *reprinted in* [1973] U.S. Code, Cong. & Ad. News 2311, 2313, and was enacted several years after the Distribution Act at issue in this case. Although it therefore has no application to the Southern Paiutes, it is nonetheless relied upon by the majority to find that the Southern Paiute Distribution Act created a trust.

The statutes referred to above indicate only that (1) the portion of the funds appropriated by the Second Supplemental Appropriations Act and earmarked for the Ute Indians were held in trust, and (2) those funds distributed pursuant to Chapter 16, Title 25, United States Code, Section 1401 *et seq.*, were not to be taxed or be considered as income for welfare eligibility purposes. Application of either statute to the Southern Paiute fund is impermissible in that it ignores the well-established rule that the granting of a substantive right to recovery, which in turn constitutes a waiver of sovereign immunity, must be clear and explicit.

In conclusion, it is apparent that nowhere in the language of the Distribution Act did Congress indicate that it intended a trust to be created, which would have, by definition, included the right to recover for breach of fiduciary duty. The general principal that the Indians are wards of the government and entitled to protection, while accurate in a broad sense, does not compel a finding that Congress intends to create a substantive right each time it enacts a piece of legislation dealing with the Indians. The rule in *United States v. Testan, supra,* constituting as it does a standard by which to judge potential waivers of sovereign immunity, requires strict construction. Analogy and implication have no place in its application. *See United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1352, 63 L.Ed.2d 607 (1980).

I would affirm the decision of the District Court *in toto.*